Judge Carr
delivered Ms opinion.
These suits arise out of the will of John D. Orr, and proceedings of his executor and trustee under it. In 1816, Dr. Orr died, leaving a will, by which he devised and bequeathed to his brother Benjamin G. Orr, his whole estate, real, personal and mixed, upon the following trusts; is In the first place, to sell and dispose of the same, or such part of the same, as lie tnay deem most beneficial for the general interest of my estate, and to apply the proceeds of *196 the same, or such yearly income or profits as may be made from the same, to the payment of all my just debts; meaning hereby, to subject all my estate, real, personal and mixed, to the payment of my just debts, and to leave the application of the same to that purpose, and the mode of raising the necessary funds from the estate, to the sound discretion of my said brother. In the second place, alter the payment of all my just debts, the surplus of my estate, or the proceeds of the sale thereof, to be given and divided by my said brother to and among my three children, Ma~ ry, Ellen and Thomas, in such shares and portions, as in the sound discretion and judgment of my said brother, to him shall seem most agreeable and expedient, according to the situation and conduct of my said children. And it is my will and desire, that such division and distribution as he shall actually make of my estate among my said children as aforesaid, or such division and distribution as he shall by writing under his hand, or by last will and testament, direct and appoint, shall be valid and binding; it bging my intention to place my said brother, in respect to my said children, to all intents and purposes, in loco pa~> rentis. And it is also my will and intention, that he be fully empowered and authorised, not only for the purpose of paying my debts, but to raise and provide a fund for division and distribution among my said children, and for their immediate maintenance, support and education, according as he shall deem it most expedient either to sell or dispose of the same or any part, in specie, to be applied to the purposes aforesaid.” The testator also appointed his said brother guardian of his children, and executor of his will, and exempted him from giving bond and security. The executor qualified. On the 11th of March, 1817, he conveyed to Castleman and M’ Cormick, for the consideration of $ 30,000, payable in instalments, a tract of land in Frederick county, belonging to the estate of his testator, called Poplimento, and thus described in the deed, “formerly the property of Eawleigh Colston, esquire, *197 and by him sold and conveyed to the late Dr. John I). Orr, by whom it was devised to the said Benjamin G. Orr, as appears by his will recorded in Frederick County Court.” On the same day, Castleman and M’Cormick conveyed the same land to Henry St. George Tucker, m trust to secure the purchase money. This deed describes the land thus; “the estate called Poplimento, being the same land conveyed to the said Castleman and M’ Cormick by an indenture of even date herewith, and to be recorded in the County Court of Frederick, by reference to which a moro complete description of the said land may be obtained.”
By deed dated the 10th of December, 1818, Benjamin G Orr assigns and convoys this deed of trust to Frederick C. Graff, together with the lands and premises therein mentioned, and all the right, title and interest of the said Benjamin G. Orr, of, in, and to the same. This deed of assignment minutely and particularly describes the deed of trust, and concludes thus; “to which reference is hereby (¿nade, as a part thereof, as if the same were here fully recited.” This deed of assignment was made as a security to Graff for the sum of $ 12,000, to be advanced by him towards completing certain water works, for supplying New-Orleans with water, “according (says the deed) “to the terms and conditions of a certain agreement, bearing even date herewith, between the said Benjamin G. Orr, Graff and II Latrobed’ This agreement is in the record, and shews a partnership between Orr, Graff and Lairobe in the adventure of supplying New-Orleans with water; and that Graff, in purchase of one third of the shares for Orrt and two thirds for himself, was to advance the $ 12,000 as they should be wanting for carrying on the work. Before this assignment of the deed of trust to Graff. Castleman and M’Cormick had paid all the instalments which had grown duo; leaving five still to be paid, the first on the 15th of April, and the others annually, on the same day. The instalment of the 15th of April, 1819, they paid to Graff; and this reimbursed him the $S.00Q ho had advanced te *198 Orr for the purchase of his shares in the water works. When the time for paying the instalment of 1820 was drawing near, Orr gave notice to Castleman and M ’ Corrnicle to pay no more to Graff, as no more was due to him under their agreement. Graff demanded the money; and hereupon, in April, 1820, Castleman and M’Cormick filed a bill of interpleader in the Winchester Chancery Court, stating the facts, and calling on the parties to inter-plead. Pending this bill, Orr, by deed of November 28th, 1820, assigned to the Bank of Washington, the deed of trust of Castleman and M’ Cormick on the Poplimento land, describing the trust deed particularly, and adding, “to which reference is hereby made as part hereof, as if the same were here fully recited.” This assignment recites, that it is máde as a further security for a debt due from B. G. Orr to the Bank. Being informed of' this fact, Castleman and M’ Cormick, in April, 1821, filed an amended bill, and made the Bank a party. On the 4th of March, 1822, the children of Dr. Orr gave a written no* tice to Castleman and M’Cormick, that they claimed the money in their hands, and warning them not to pay to any other person; whereupon, Castleman and IWCormick, by another amendment, added them to the defendants, in their bill of interpleader. In April, 1S22, B. G. Orr died intestate, insolvent, and without having made any appointment among the children, in execution of the power given by his brother’s will.
The parties defendant (except Graff,) answered, setting out their claims. Each party defendant also filed a bill making all the rest defendants. All answered, except Graff. It was agreed, that his original bill should be taken as the exhibition of his claim: that the children of J. D. Orr and the Bank should be taken as parties thereto; and that the. exhibits in that case be received in the cases of interpleader.
During the progress of the cause, all the instalments, as they became due, were paid into Court In 1823, the *199 children filed their hill against the administratrix of i!. G. Orr for an account. She answered that she was willing to account. A reference was had, a report returned, and not being excepted to, was confirmed. It shewed a balance of ,18 8,053 45 cents, for which there was a decree when assets. The record of this case is by agreement admitted as an exhibit in behalf of the children; and in 1825, the cases heing consolidated, and coming on to be heard by consent, as to all parties, the Court rejected the claims of Graff and the Bank, and decreed that the receiver pay to the children the money and interest in his hands, deducting the costs of Castle-man and M’ Cormick. But the fund in the hands of the children, was decreed to be subject to the claims of the creditors of J. D. Orr, if any there be yet unsatisfie.d, and legally and equitably entitled to come upon that fund. The payment to the children was, therefore, suspended, till they should each give to the marshal bond with good security in double the amount decreed to them, conditioned to pay their proportions of any debts, which may be established by due course of law., against the estate of J. D. Orr, and against the fund in their hands. From this decree the appeal is taken by Graff and the Bank.
This cause, so important in its principles, so interesting in its character, has been most elaborately and ably argued by counsel.
The first objection taken to the decree is, that, the proper parties are not before the Court. It is insisted that, after the death oí'Ji. G. Orr, an administrator de bonis non of Dr. Orr, should have been appointed, and made a party to the suit; that the estate of Dr. Orr, for want of this proceeding, is unrepresented; and the case of Hays v Hays, 5 Munf. 418, is relied on, where this Court dismissed a bill brought by persons suing as children of a deceased residuary legatee, because they were not the legal representatives. This objection seems to me to be founded on a mistake of the nature of the fund. Dr. Orr devised the *200 land to B G.- Orr, and subjected it to the payment of his debts. He also appointed B. G. Orr his executor and trustee. But, this did not make the land legal assets. This Court decided, in Jones v. Hobson, 2 Rand. 483, that the proceeds of land devised to be sold, are not a testamentary subject; that executors hold such proceeds, not as executors, but as trustees; and that the sureties of an executor are not responsible for the proceeds of land sold by him» Here, the trust embraced not only the payment of debts, but the maintenance and education of the children, and the distribution of the surplus among them; a trust highly confidential and personal. An administrator de bonis non of Dr. Orr would have nothing to do with this fund, and therefore need not be before the Court. The fund certainly belongs either to Graff, the Bank, or the children; and it will be seen, that in decreeing it to the latter, the Court of Chancery took especial care to protect their father’s creditors. This objection, therefore, has nothing in it, in my opinion; and should be the rather discountenanced, as the parties went to a hearing by consent, intending to waive all irregularities, and come to a decision on the merits.
Taking it up, then, upon the merits, we are to enquire, to which of these claimants the property belongs. All derive title from the will of Dr. Orr; the children, directly; the others through the medium of B. G. Orr. By the will, it is clear, that B. G. Orr was a fiduciary merely; that he had not the slightest beneficiary interest in the estate. It is all devised to him, first, to pay debts; secondly, to distribute among the children. Ample powers and a wide discretion are given him, but solely for the attainment of these objects. All the property is subjected to the payment of his debts; “leaving the mode of raising the funds from the estate, to the sound discretion of my brother.” After payment of the debts, the surplus is to be divided among his children, “ in such shares and proportions, as in the sound discretion and judgment of my brother, shall seem most agreeable and expedient.” As regards the *201 children, the will places him in loco parentis; but, this relates merely to his power of managing the fund for them, and distributing it among them. It gives him no indiVidual interest in, or right to, one cent of it. If all the children had died infants, he could not, under the will, have claimed an atom of the estate.
But, granting all this; it was contended in the argument, that under the powers given to B. G. Orr, and the circumstances attending these transactions, the law would compel this Court to support the assignments of the deed of trust, both to Graff and the Bank; and that, whether It. G. Orr acted as executor or as trustee in the assignments. Let us examine this, taking him^rsi as executor, and secondly, as trustee.
In the cases of Nugent v. Giffard, 2 Ves. 269, and 1 Atk. 463; Meade v. Ld. Orrery, 3 Atk. 235, and Tanner v. Ivie, 2 Ves. 466, Lord Haiidwicke would not suffer creditors or legatees to follow assets into the hands of a purchaser from the executor or administrator, unless there was evidence of fraud or collusion between them Nor did he consider it evidence of such fraud and collusion, that the executor was applying the assets to the payment of his own individual debt, and this, with the knowlege of the purchaser.
In Whale v. Booth, cited 4 Term Rep. 625, note, Lord Mansfield went quite as far. He said, “ the general rule, both of Jaw and equity, is clear, that an executor tnay dispose of the assets of the testal or: that over them, lie has absolute power; and that they cannot be followed by the testator’s creditors. It would be' monstrous, if it were otherwise; for, then no one would deal with an executor. He must sell in order to effect the will; but who would buy if liable to be called-to an account. It is also clear, that if, at the time, the purchaser knows they are assets, that is no evidence of fraud, for all the testator’s debts may he satisfied; or, if he knows that the debts are Slot all satisfied, must he look to the application of the m» *202 ney ? No one would buy on sueb terms. There is one exception, indeed, where a contrivance appears between the purchaser and the executor to make a devastavit ”
These decisions have certainly been much narrowed and modified, if not overruled, by the later cases. Thus, in Bonny v. Ridgard, 1 Cox. 145, Lord Kenvon, Master of the Rolls, speaking of the ease of Meade v. Ld. Orrery, says, “It certainly becomes me to think much, before I differ from Lord Hardwicke, but I cannot subscribe to his opinion in that case; and if it had come before me, I should have decided it'in direct opposition to that authority.” “Nothing can be clearer,” he says, “ than that an executor may go to market with his testator’s assets, and that in general a purchaser will not be bound to see to the application of the money; but, common honesty requires, that if there is either express or implied fraud, the parties shall not avail themselves of it.” The circumstances of the case before him were these. R. W. having several leasehold estates, made his will, and gave them to his wife, and their daughters, to be equally divided between them; and desired that his said estates might be sold the first opportunity, as his executors might think most proper; and made his wife and another, executors. The widow alone proved the will, and entered on the premises. She married Ridgard soon after; they mortgaged the premises to M.; and afterwards, assigned the equity of redemption to Barnard, and 6l. paid in hand, at the date of the assignment. The bill was filed by the daughters and their husbands against Ridgard and wife, Barnard and his vendee, to set aside the assignment to Barnard, and for account, &c. Sir Thomas Setval, Master of the Rolls, before whom the cause was first heard, thought that the children should not be prejudiced by the assignment, and decreed accordingly. The cause was re-heard before Lord Kenton. After laying down the general principle before quoted, he applies it thus; “The fund in the hands of the widow was applicable to the payment of the debts, and after that, to *203 certain defined purposes declared by the will. Barnard had full notice of the will. Ho knew that after the debts were paid, this fond ought to he so applied; and he therefore connived at its being misapplied. If then the case turned on this. I should be bound to set aside the transacfian, or rather to turn the defendants into trustees for the plaintiffs.” But, on the ground of delay, (near twenty years having passed after the youngest child came of age, before filing the bill) he dismissed the cause.
The next case I shall cite is Scott v. Tyler, 2 Dickens, 712. In that case, an executrix, as a security for her own debt, had disposed of bonds, the assets of her testator, four years after his death. The Bankers swore that they knew nothing of the will, and believed the bonds to he her own property, not that of the testator. Lord T iiur low says, “If one concerts with an executor, by obtaining the testator’s effects at a nominal value, or at a fraudulent undervalue, or by applying the real value to the purchase of other subjects for his own behoof, or in extinguishing the private debt of the executor, or in any other manner contrary to the duty of the office of executor, such concert will involve the seeming purchaser or his pawnee, and make him liable for the value.” He concludes, “I think the defendants Han key must deliver up the bonds, and account for the interest they have received upon them.” The part of Lord Thurlow’s opinion touching these bonds, was not delivered in Court, because that part of the case was compromised: but in 17 Ves. 165, Lord Eldon says, “With regard to the case of Scott v. Tyler, I can confirm the assertion of Mr. Dickens, that the judgment stated by him contains Lord Tiiurlow’s opinion, intended to have been delivered as his judgment, if a compromise had not, taken place.”
In Hill v. Simpson, 7 Ves. 152, Sir William Grant set aside the transfer of assets by an executor, to secure his individual debt, under circumstances of gross negligence, though not of direct fraud in the creditors, to whom *204 they were transferred. He says, “Though it may be dan» gerous, at all to restrain the power of purchasing from an executor, what inconvenience can there be in holding, that the assets, known to be such, should not be applied in any case for the executor’s debt, unless the creditor could be first satisfied of his right ? It may be essential that the executor should have the power to sell the assets; but it is not essentia], that he should have the power to pay his own creditor; and it is not just that one man’s property should be applied to the payment of another man’s debt.” Of the creditors he says, “ I do not impute to them direct fraud; but they acted rashly, incautiously, and without the common attention used in the ordinary cóurse of business. It was gross negligence not to look at the will, under which alone a title could be given to them.”
The case of M’Leod v. Drummond, 14 Ves. 352; 17 Ves. 152, was one of a pledge by the executor of the testator’s bonds, upon advances of money. The bill was filed by a co-executor, and it was dismissed by Sir William Grant. The bonds pledged were specifically bequeathed by the testator, and the money was advanced at the time the pledge was made, and upon the credit of it. The Master of the Rolls said he had found no case, where the money had been advanced at the .time to the full value of the assets, that it was ever called back. Lord Eidow, on the appeal, affirmed the decree at the Rolls, on the length of time and some other particular circumstances; but it seems clear, that on the general doctrine be did not agree entirely with the Master of the Rolls. He goes into a la» borious and able review of all the cases. “ The Master of the Rolls,” he says, “truly observes that there is a great difference between advancing money at the time upon securities, and taking a security in discharge of an antecedent debt; but that is by no means conclusive. The argument is carried nearly to this extent; that a person lending money at the time, upon the deposit of the securities, cau hardly be supposed to mean fraud,, as there is no tempta *205 tiion io fraud. Admitting, however, that the Bankers had no other motive for the advance upon such a deposit, than they generally have; if it appears in the transaction itself, that the borrower is about to apply the money so raised on the testator’s property, to objects with which his affairs have no connection, I should hesitate to say, that as the temptation was so slight, this Court would not examine, whether that was not a most inequitable transaction, with reference to the persons entitled to that property.”
I also refer to the ease of Field v. Schieffelin, et al. 7 Johns. Chan. Rep. 150, where the cases are reviewed by Kent, C,h„ and the conclusion from the whole drawn with his usual clearness and ability.
In the case of Dodson v. Simpson, also 2 Rand. 294, the doctrine is correctly, though briefly laid down.
The latest English case that I have met with, is Keane v. Roberts, 4 Mad. Ch. Rep. 332. There the Vice Chancellor gives the result of an examination of all the eases, thus: “ Every person who acquires personal assets by a breach of trust, or devastavit in the executor, is responsible to those who are entitled under the will, if he is a party to the breach of trust. Generally speaking, he does not become a party to the breach of trust, by buying or receiving as a pledge, for money advanced to the executor at the time, any part of the personal assets, whether specifically given by the will, or otherwise; because this sale or pledge is held to be prima facie consistent with the duty of an executor. Generally speaking, he does become a party to the breach of trust, by buying or receiving in pledge any part of the personal assets, not for money advanced at the time, hut in satisfaction of his private debt; because this sale or pledge is prima facie inconsistent with the duty of an executor. I preface both these propositions with the words generally speaking, because they both seem to admit of exceptions. Thus a sale or pledge for the private debt of the executor, has been supported under special circumstances, in Lord ilA^nwrora’s two *206 cases of Nugent v. Gifford, and Meade v. Lord Orrery, though not entirely to the satisfaction of every succeeding Judge; and Lord Eldon seems to consider the case of M'Leod v. Drummond as an exception to the first proposition. It was upon the principles of these propositions, that Sir W. Grant proceeded in M’Leod v; Drummond,„ He there supported the pledges of the testator’s bonds, because the’y were deposited in respect of advances made at the time. In the same case, Lord Eldon, on the appeal, admitted these principles, but seemed to consider the circumstances of that case, as forming an exception to the general rule. The advances, though made at the time, were made to two executors who were partners as army-agents, and necessarily, therefore, for their private purpoposes; and he inclined to think that the Bankers were, for that reason, as much parties.to the breach of trust, as if they had applied the money to pay the private debt of the executors. I cannot,” he adds, “ but lean strongly to Lord Eldon’s view of that case. If a party dealing with an executor for the personal assets, pays his money to the-executor, so that it may be applied to the purposes of the will, he is not responsible for the executor’s misapplication of it. But, if in dealing with the executor, he does in truth pay his money for the private purposes of the executor, he is equally a party to the breach of trust, whether he applies his money to the private debt of the executor, or to the private trade of the executor.” This is a clear statement of the doctrine as settled by a long course of decisions; settled too, as I think, on the basis of reason and equity; for, I heartily agree with Sir William Grant, that it is not essential that an executor should have the power of paying his own creditor with the assets; nor is it just that one man’s property should be applied to the payment of another man’s debt.
Let us apply this doctrine to the case of the claimants here; and first to Graff, whose case is certainly much the strongest. He took a transfer of the trust property, as s *207 security for money to be advanced to the private trade of ¿he executor; a trade, having not the slightest connection with the estate of the testator, or the objects of the trust. But, it is objected that he had no notice of the nature of the fund, or the right in which B G. Orr held it. Of express notice, there is no proof; and it is insisted, that this la a case, to which constructive notice does not apply; that it applies to the purchaser of real estate only, who cannot protect himself as a purchaser without notice, till he has used due diligence in the examination of his title. No authority is cited to support this distinction. In all the cases Which I have adduced, personal chattels were the subject; and yet the doctrine of implied notice is considered as ap plying to them; and the case of Hill v. Simpson is decided expressly on that ground.
Again. The assignment here, was of an incumbrance on land, in effect a mortgage; and we know that the doctrine of constructive notice, is constantly applied to such incumbrances. Upon the ground of reason, what difference is-there, whether the subject be real or personal estate? He who purchases any subject, with notice of the equitahle right of another, is the trustee for that other, to the extent of his equity; and this, whether the notice be express or implied. Express and implied notice differ, not in their effect, but in the mode of proof only. In the one, you prove the fact of notice expressly; in the other, you prove circumstances, which raise a presumption of notice; and if the presumption be strong enough to fix the notice, it affects the conscience of the party jus" as much as express notice. Thus in any purchase, if there be circumstances which, in the exercise of common reason and prudence, ought to put a man upon a particular enquiry, he will be presumed to have made that enquiry, and will be charged with notice of every fact, which that enquiry would give him; and this conclusion is a just and necessary one; for, if a party means to deal fairly, self-interest, the strongest principle of action, will prompt him to the enquiry; ant! if *208 he means to deal fraudulently, the rule prevents him from voluntarily shutting his eyes, and saying he had no notice. This reasoning applies as well to real as personal estate. Both upon reason and authority, then, this is a case to which constructive notice applies; and of this, there was the clearest and strongest.
The deed of assignment refers to the deed of trust as a part of itself. The deed of trust refers expressly to the original deed, and that as expressly, to the will of Dr. Orr, where the whole trust is declared._ Of this trust, then, Graff had full notice, and knew that by the trade, the executor was committing a gross breach of trust. He was a party to that breach, “ by paying his money to this private trade of the executor.”
But it is said, that this was an advancement of money at the time; and it cannot be imagined that there was any temptation to the lender to commit a fraud for the purpose of securing the return of that same money, which he then had, and might have kept; and Sir William Grant’s opinion in M’Leod v. Drummond, is relied on. We have seen, however, that Lord Eldon differed from Sir W. Grant in this; as did the Vice Chancellor in Keane v. Roberts. But in truth, this was neither an advancement at the time, nor was it a simple loan of money. It was a purchase of shares in the New Orleans water works, and an agreement to advance, as the money should be wanting for carrying on the work. The strong temptation was held out to Graff, of entering into a speculation, by which he might double and treble his money, at the same time that he provided for his safety by taking a security on the trust fund. His case, therefore, does not come at all within the reason of those, where a party, meaning simply to lend his money at legal interest, (which he can always do,) is supposed to lie under no temptation to commit a fraud, in taking a security for its return.
I have thus far considered B. G. Orr as executor; but it is, in truth, a case of pure trust, as I have already shewn 5 *209 •mil ibis, it will he found, makes it a much stronger case for the cestui que trusts. Thus, in Andrew v. Wrigley, 4 Bro. Ch. Cas. 125, Lord Alvanley, Master of the Rolls, says, "With respect, to a trust for payment of debts, there is no pretence that such a trustee could alien in payment of his own debt;” and he refers to Ithel v. Beane, 1 Ves. 215. There an estate was devised to a son, subject to payment of debts. The. son mortgaged the land to a creditor of the father, who also advanced to the son morn money. Lord Haedwicke held that this mortgage should interfere in no manner with the rights of the father’s other creditors. He says, "This is not like the ease of an executor, who, having power to administer the assets, and the legal estate in him, may sell a term, and the vendee retain it, and this even to satisfy a debt of his own. Rut, that is owing to the legal power of an executor over the. assets, upon which this Court will not break in. But, it was never held, that if a devisee in trust mortgaged to a creditor of his own, for satisfaction or security of that debt, such mortgagee having notice of the trust, should retain the estate against the creditors under that trust.”
In Read v. Snell, 2 Atk. 642, Lord Haedwicke, m considering the power of executors, who were also trustees, and to whom a very large discretion was given by the will, says, 88 Here the executors are made trustees, and therefore, from the nature of the thing, are to take nothing for their own benefit, unless it had been particularly given to them. They have no ownership, and therefore cannot alter the interests of the ce.síuis que trust.”
In Mabank v. Metcalfe, 3 Atk. 95, Lord Haedwicke rays, "There is an established difference in this Court, between an executor and a trustee. For, the trustee has the legal right only, and is merely nominal; but, an executor ha? something more in him than the mere legal right as a bare trustee; for, he has a beneficial interest, if there is any surplus.”
Dickerson v. Lockyear, 4 Ves. 36, is also a strong case to shew the difference between an executor and a trustee, *210 There, an act. done by a trustee was set aside, though no fraud was imputed; the Chancellor saying, that if it had been the act, of an executor, he should not have quarrelled with because the executor had the whole legal property, was bound to pay debts, and might convert assets. “But,,J (he says,) “what was Lockyear’s situation, what was his legal power? He was no executor. He is devisee nominally, it is true, of all the effects; but in trust, &c.,” for the purposes of the will. Thus we see, that taking B. G. Orr for what he really was, a trustee, the case is still more clear against those who dealt with him.
It was contended in the argument, (but, as I thought, not with confidence,) that at the time of the assignment to Graff, B. G. Orr was so far in advance to the estate of his brother, as to be authorised to appropriate to his private trade, the 115,000 due on Poptimento. The answer seems to be, that Graff being a purchaser with notice of the trust, dealt with Orr at his peril: that it devolved on him to shew Orr’s authority for diverting the trust, fund to his individual use: that if he had meant to rely on Orr’s being in advance, he should have made that a part of his case, put it in issue, and had an account settled to establish the fact. Nothing of this kind was clone. The fact is not stated in Graff’s bill, and the only evidence we have on the subject, is a report made by a commissioner, in a case to which Graff was no party. A report made with no view to the fact of Orr’s being in advance to the estate at any particular time; and which, if evidence at all in Graff’s case, by no means establishes the fact.
Í shall waste no time on the ease of the Bank, which is much weaker than Graff’s, and to which all the law and reasons adduced apply a multo fortiori. Nor shall I trouble myself with canvassing the claims of Graff or the Bank against B. G. Orr individually. It is enough for the purposes of this cause, that they have no claim upon the trust fund.
I am clear that the decree of the Court below be affirmed.
Judges Gbsen, Coalteb, and Cabell concurred, and the decree was affirmed.*

 The President absent